Juana Betancourt Hernández, demandante y apelada, *v.* Consuelo González Vda. de Piéras, demandada y apelante.

Núm. 7656.—*Sometido:* Marzo 16, 1939. *Resuelto:* Marzo 17, 1939.

Angel A. Vázquez, abogado de la apelante; *Francisco M. Susoni, Jr.,* abogado de la apelada.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

Éste es un caso sobre *homestead,* fallado en pro de la reclamante Juana Betancourt viuda de Pérez.

Los hechos tales como surgen de la certificación del Registrador de la Propiedad de San Juan presentada por la propia parte demandada, son los que siguen:

En abril 14, 1924, se verificaron en el Registro las inscripciones primera y segunda de la finca número 2576 consistente en la mitad de un solar que su dueña Nicasia García segregó y vendió por $175 a Manuel Vega. Éste comenzó a construir en el solar una casa e hipotecó el solar y la casa a Emilia Surís Cardona para garantizarle $550 que le tomó prestados por término de un año.

En julio 29, 1924, Vega vendió la finca a Juan Pérez, casado con Juana Betancourt, la demandante, por $1,500 de los cuales el vendedor confesó recibidos mil y los quinientos

cincuenta restantes los dejó en poder del comprador para atender a la hipoteca constituída a favor de Emilia Surís Cardona de cuyo pago se hizo cargo.

Por escritura de diciembre 4, 1924, Pérez y su esposa hipotecaron la finca a Consuelo González viuda de Pieras, la demandada, en garantía de mil dólares que le tomaron a préstamo, de doscientos cincuenta más para costas y de los intereses, y

Por escritura de igual fecha Emilia Surís Cardona canceló su hipoteca.

Nada expresamente consta del Registro sobre el derecho de *homestead* y nada tampoco sobre el empleo que debiera darse al dinero prestado por la demandada.

¿Qué demostró la evidencia testifical?

La de la demandante se resume, en la exposición del caso, así:

"Declaración bajo juramento de Juana Betancourt, quien dijo, en síntesis a preguntas de la demandante: que fué casada con Juan Pérez Serrano, con quien tuvo seis hijos llamados Eva, Andrés, Antonia, Socorro, Ramón y Rita, que son todos menores de edad, viven en su compañía y son mantenidos por ella y dependen de ella, habiendo fallecido su esposo en el año 1930; que ella y su esposo fueron dueños de la finca objeto de este pleito y después que la compraron se fueron a vivir a ella; que no vive ahora la finca porque fué lanzada de allí por el Márshal con sus seis hijos; que ella y su esposo no han tenido ninguna otra finca; que en la hipoteca de $1,000 que ella y su esposo Juan Pérez Serrano hicieron a favor de Consuelo González no se renunció el derecho a *homestead;* que esa finca la adquirieron ella y su esposo estando ambos casados."

Y la de la demandada, como sigue:

"Declaración bajo juramento de Ernesto Ruiz, quien dijo, en síntesis, a preguntas de la demandada, que en diciembre del año 1924 él hacía negocios como 'corredor' y, entre otras personas, colocaba a préstamo dinero de doña Consuelo González, la demandada; que en uno de los primeros días de ese mes de diciembre se le presentó Juan Pérez Serrano manifestándole que debía un dinero de la compra de su casa por cuyo importe tenía una hipoteca doña Emilia Surís; que esa hipoteca se la iban a ejecutar y necesitaba tomar a préstamo

$1,000 para pagarla, pagar contribuciones debidas por la finca y hacerle reparaciones a la casa; que fué a ver la finca y como encontró que ésta respondía a la cantidad pedida, entonces le comunicó el negocio a doña Consuelo González quien lo aceptó; que entonces concurrieron en ese mismo mes de diciembre a la notaría de don Julio César González el señor Pérez Serrano, la esposa de éste, así como doña Consuelo González, la acreedora hipotecaria señora Surís y el declarante, y allí entregó la señora González los mil dólares y de ellos se pagaron allí mismo a la señora Surís los $550 de su hipoteca, se dejaron en poder de la propia señora González ciento y pico de pesos para pago de contribuciones debidas por la finca, las cuales fueron después pagadas, y se entregó el resto que sobró al señor Pérez Serrano y entonces se firmaron las escrituras de hipoteca y de cancelación de hipoteca; que posteriormente el declarante fué a la casa de Pérez Serrano y vió que con el dinero sobrante se habían hecho las reparaciones ya indicadas, construyéndosele también un mirador, y que hace algún tiempo había tenido conversación con la demandante y ésta reconoció que el dinero sobrante se había invertido en reparaciones de la casa y en el mirador aludido.''

Llamada entonces nuevamente la demandante, declaró:

''. . . que Ernesto Ruiz no estaba presente cuando se firmaron las escrituras de hipoteca a favor de doña Consuelo González y cancelación de la hipoteca de la señora Surís; que la primera vez que vió a Ruiz fué hace algún tiempo en la casa de doña Consuelo González; que el dinero de la hipoteca de la señora Surís lo pagó el esposo de la declarante poco a poco, pues era comerciante; que el dinero de la hipoteca de doña Consuelo González lo tomó el esposo de la declarante para negocios de comercio.''

Resolviendo el conflicto que se advierte entre ambas declaraciones y apreciando a la vez la prueba documental, dijo en su opinión la corte sentenciadora:

''A nuestro juicio, no hay relación alguna entre la primera hipoteca constituída a favor de doña Emilia Surís Cardona y̆ la segunda hipoteca constituída a favor de la demandada en este pleito. No hay prueba alguna que establezca que los mutuantes en el segundo contrato de préstamo redujeran como parte del precio de la finca los $550 de la primera hipoteca. Es muy sutil esta defensa de la demandada. No encontramos tampoco evidencia, salvo la de don Ernesto Ruiz, que es un corredor de negocios que detalla que el dinero de la segunda

hipoteca lo recibieron los deudores para mejoras de la casa; y lo más que llegó a decir este testigo fué que la hipoteca se utilizó para pagar contribuciones y para el pago del primer préstamo que existía con la Sra. Surís Cardona, pero tal testigo fué contradicho por la propia demandante, quien manifestó que cuando se hizo esta hipoteca, ellos vivían en la casa, donde siempre vivieron desde que la adquirieron y el dinero fué empleado por el marido en negocios y no en reparaciones, mejoras ni pago de contribuciones. No hay alegación alguna, porque no existe, ni aparece de la certificación del Registro de la Propiedad, que el *homestead* se hubiera renunciado, si es que tal derecho es renunciable en este caso, y el testimonio de la demandante es de un candor y simplicidad tales que llevan a la mente del juzgador serias dudas de si el Sr. Ruiz, corredor que intervino en la transacción de la segunda hipoteca, necesariamente estuvo presente cuando se hizo lá transacción. La certificación del Registro es clara y terminante. No ha existido ninguna de las excepciones que la ley de *Homestead* señala que impedirían el ejercicio del derecho del *homestead* que reclama la demandante que es cabeza de familia y que ocupa la casa después de la muerte del esposo para beneficio de sus hijos. Es evidencia que no ha sido contradicha por la demandada y que merece al tribunal entero crédito. También quedó establecido que el contrato de préstamo garantizado con hipoteca, hecho por la demandante y su esposo y por la demandada, se realizó cuando aquéllos vivían en la casa con su familia. La escritura en donde se hace constar tal transacción no contiene, porque no aparece del Registro, alteración o variante alguna que menoscabe el derecho de hogar seguro reconocido por la ley a todo jefe de familia, que tenga familia y que ocupe o resida en una finca, con su familia. La demandada sabía o debía saber tal circunstancia y al contratar debió tener en cuenta el derecho de *homestetad* que existía a los mutuantes en la contratación.''

No conforme la demandada, pidió a la corte de distrito que reconsiderara su sentencia. La reconsideración fué negada en lo substancial y apeló entonces para ante esta Corte Suprema. Señala en su alegato cuatro errores cometidos a su juicio por la corte sentenciadora, 1, al dirimir el conflicto entre las declaraciones de la demandante y el testigo Ruiz, 2, al negarse a reconsiderar su sentencia, 3, al declarar la demanda con lugar y 4, al condenarla a pagar quinientos dólares sin prueba de que la finca fuese vendida por más de esa suma.

Resolviendo una moción que la parte demandada le presentara, la corte de distrito reconsideró su sentencia de modo favorable a la dicha demandada en cuanto a su pronunciamiento de costas y reafirmó su criterio en cuanto a la procedencia de la reclamación de *homestead*. El segundo señalamiento es, pues, superfluo. Está incluído en los demás.

Reconocemos que el argumento de la apelante en cuanto a la decisión del conflicto de la evidencia por parte del juez sentenciador, es fuerte, pero no de tal modo que nos convenza de que dicha decisión sea errónea. En tal virtud no debemos ni nos sentimos tampoco inclinados a alterarla.

En cuanto al criterio legal aplicado por la corte de distrito a los hechos del caso tales como apreció que resultaban de la evidencia aportada, creemos que encuentra apoyo en la ley y en la jurisprudencia. Bastará referirnos al caso de *Aldea* v. *Tomás y Piñán*, 51 D.P.R. 764, 774, en el que se dijo:

"Pero hay más. Se reconoce que ni al celebrar el pacto con Gayol ni al contratar luego con la causante de los demandados hubo renuncia del derecho de hogar seguro por parte de los esposos Pozada-Aldea. También se reconoce que no hubo acuerdo alguno sobre subrogación de la Señora Piñán en el lugar del Sr. Gayol. A lo más que puede llegarse es a concluir que quedó demostrado que necesitando los esposos Pozada-Aldea dinero para pagar su deuda con Gayol lo pidieron a la Sra. Piñán y de ella lo obtuvieron como un contrato corriente, independiente, de préstamo garantizado con hipoteca, sin consideración alguna al destino que el prestatario habría de dar al dinero recibido. El empleo del dinero, aún aceptando como cierta la declaración del demandado Caneja, no puede concluirse que fuera una condición para la celebración del contrato. Y la jurisprudencia ha resuelto que tales operaciones no son las que garantiza una ley como la nuestra en contra del derecho de hogar seguro.

"En el caso de *Engaard* v. *Schmidt*, 171 N. W. 905, 906, la Corte Suprema de Nebraska se expresó así:

" 'El hecho de que un hombre casado tomara dinero a préstamo, y le manifestara al prestamista al momento de hacer el préstamo, que tenía el propósito de usar el dinero, o parte del mismo, para pagar un hogar seguro previamente adquirido y enajenado, y de que el di-

nero se use efectivamente para ese fin, no basta, cuando figura aislada-mente, para que dé derecho al prestamista a tener un gravamen a su favor por el precio de la compraventa. En el caso de autos no existía entre las partes la relación de vendedor y comprador, ni se creó un gravamen a favor del vendedor u otra carga similar. La deuda fué constituída y las enajenaciones hechas mucho antes de efectuarse el préstamo. El demandante no pagó la deuda a instancias del deudor, sino que meramente le prestó el dinero directamente sin que hubiera pacto alguno respecto al uso que debía dársele al mismo. *Rodman* v. *Sanders,* 44 Ark. 504; *Griffin* v. *Proctor's Adm'r.,* 14 Bush (Ky.) 571; *Carey* v. *Boyle,* 53 Wis. 574, 581, 11 N. W. 47.'

"El caso de *Ruiz* v. *Barreto,* 46 D.P.R. 369, 372, no tiene el alcance que le dió la corte sentenciadora y le da la parte apelada. Quizás debimos ser en él más específicos, pero no surgió allí la necesidad para ello, porque la decisión que se dictaba lo era en favor del reconocimiento del derecho de hogar seguro. Nuestra opinión en aquel caso debe interpretarse en armonía con ésta que emitimos ahora. Si ambas partes convienen en que el dinero prestado debe emplearse para saldar en todo o en parte la deuda o el gravamen incurrido por la compra de la propiedad o para las mejoras que en ella se hicieren (*Disponiéndose* de la sec. 4 de la Ley de Hogar Seguro, Código de Enjuiciamiento Civil, ed. 1933, págs. 306 y 307), y en realidad se emplea, entonces el destino que debe darse y se da al dinero recibido en préstamo, es y debe considerarse como una condición del contrato que coloca al nuevo prestamista en la misma situación que al antiguo en cuanto al derecho de hogar seguro."

No creído, pues, el testimonio de Ernesto Ruiz y dándole crédito al de la demandante, precisa concluir que no hubo pacto alguno que llevara el caso de ésta a caer dentro de la excepción. Lo que de los autos surge es una operación corriente de préstamo con hipoteca que no destruye el derecho de hogar seguro que por otra parte resulta debidamente constituído.

En cuanto a que no se probó que la finca hipotecada se vendiera por más de quinientos dólares, debe reconocerse que tiene razón la apelante cuando sostiene que de la evidencia no consta el precio de la venta, pero ello carece de importancia porque no es el valor de la venta lo que hay que tomar en consideración sino el de la finca, y por lo que respecta al

de la finca hay datos suficientes en dicha evidencia para concluir que era por lo menos tres veces mayor a esa suma.

En el propio caso de *Aldea* v. *Tomás y Piñán*, antes citado, a la página 776, se dice:

"El derecho de hogar seguro está reconocido por la ley. Su naturaleza ha sido fijada en repetidas decisiones de esta propia Corte Suprema. Se disfruta en la finca, pero sólo se extiende en ella hasta el valor de quinientos dólares y cuando la finca se vende por ser su valor mayor para hacer efectivas obligaciones del dueño no exentas de ejecución, queda reducido a la suma de quinientos dólares."

*Debe declararse sin lugar el recurso y confirmarse la sentencia y resolución apeladas.*